Filed 6/23/22  In re M.S. CA4/2

*See dissenting opinion*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re M.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.S.,<br><br>Defendant and Appellant. | E077740<br><br>(Super.Ct.No. SWJ009794)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.  Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Gregory P. Priamos, County Counsel, Teresa K.B. Beecham and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant and appellant, D.S. (Mother), is the parent of M.S., a dependent child of the juvenile court who will turn 18 years of age in June 2022. Mother appeals from the August 5, 2021 orders terminating her parental rights to M.S. and selecting adoption as M.S.'s permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Mother claims (1) insufficient evidence supports the court's August 5 finding that M.S. was adoptable; and (2) postjudgment evidence that, in September 2021, M.S. had left her prospective adoptive parents' home and no longer wished to be adopted by them is both admissible in this appeal and undermines the adoptability finding. Thus, Mother claims the section 366.26 orders must be reversed.

Petitioner and respondent, Riverside County Department of Public Social Services (DPSS), counters that (1) substantial evidence supports the August 5, 2021 adoptability finding, and (2) this appellate court is not the proper forum to consider the postjudgment evidence that M.S. left her adoptive home in September 2021 and no longer wished to be adopted. DPSS points out that M.S. can petition the juvenile court to reinstate Mother's parental rights, before M.S. turns age 18, if DPSS agrees that M.S. is no longer adoptable, and the juvenile court can grant the petition if it finds that reinstating Mother's parental rights would serve M.S.'s best interests. (§ 366.26, subd. (i)(3).) Thus, in this scenario,

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

DPSS argues M.S. will not become a "legal orphan." M.S. agrees; her appointed counsel in this appeal has filed a letter brief joining DPSS's arguments.

We affirm the section 366.26 orders. Substantial evidence supports the court's August 5, 2021 finding that M.S. was adoptable. The postjudgment evidence that M.S. left her prospective adoptive home in September 2021 and no longer wished to be adopted is inadmissible in this appeal.

## II. FACTS AND PROCEDURAL BACKGROUND

M.S. and her twin sister, J.S., were born in June 2004.[2] In December 2004, the girls were removed from their biological mother, and the biological mother's parental rights were terminated in August 2006. The girls began living with Mother in 2006, and Mother adopted the girls in April 2007.

Between July 2007 and January 2019, DPSS received numerous referrals alleging that Mother deprived the girls of food and abused the girls both physically and emotionally. Before the current petition for the girls was filed in January 2020, the girls had two prior dependency cases with Mother, one from 2010 to 2012 and a second from 2013 to 2014. DPSS reported that the two prior dependencies were "due to the same current concerns" expressed in the current petition: "deprivation of food and inappropriate care."

In both prior cases, the girls were removed from Mother's care but were returned to Mother after she received reunification services. The second case arose following a

---

[2] J.S. is not a party to this appeal.

3

report that Mother was "very controlling" over the girls' food and that M.S. had been diagnosed as "emotionally disturbed."

The family most recently came to DPSS's attention in December 2019. On December 10, M.S. arrived at a high school, where she was attending afterschool tutoring, "extremely agitated," saying she was angry with Mother and would not go home with Mother. Mother was called to the school because M.S. was having difficulty controlling her emotions.

After Mother arrived at the school, Mother said that M.S. had missed taking her Xanax because Mother had been unable to fill the prescription. M.S. and Mother argued, then Mother grabbed M.S. by her hoodie and tried to pull M.S. into Mother's car. As M.S. tried to push Mother away, Mother pinned M.S. against a railing and tried to hug and kiss M.S. Mother said to M.S.: " 'If you're not gonna go with me, I'll take off your clothes and we'll take care of it right here.' " Law enforcement was present and arranged for Mother to take M.S. home, but M.S. ended up walking home.

On December 11, 2019, M.S. walked into a fire station and asked for the number to an emergency shelter for teens. The firefighters took M.S. to a hospital where she said she wanted to hurt Mother, she did not feel safe at home, and she wanted to go to the shelter. DPSS received general neglect referrals concerning Mother based on the incidents of December 10 and 11. On December 19, a social worker interviewed M.S. at M.S.'s school. The worker noticed that M.S.'s hair was extremely dry and uncombed. M.S. "appeared timid" and was reluctant to talk to the social worker, saying Mother

4

would be "mad" at her. After she was shown a list of standard interview questions, M.S. agreed to be interviewed.

M.S. said that J.S. did "not really" live at home; most of the time, J.S. lived with a family friend in San Diego, Lisa W., a nonrelative extended family member (NREFM). J.S. would sometimes come home on weekends. M.S. then described the conditions that M.S. and J.S. were experiencing in Mother's care. Mother did not allow M.S. to choose her own food or to have second helpings of food. Mother would sometimes get food from restaurants only for herself and would eat the food in front of the girls. M.S. did not ask Mother why she did this because that would be "talking back."

Mother's home was full of "junk." There was one small, open spot at the kitchen table where Mother made the girls eat, one at a time. Mother did not eat meals with the girls, and M.S. would stay in her room while J.S. ate alone in the kitchen. Mother also would not allow the girls to go into the kitchen because they would "sneak" food. Mother slept in the living room, near the kitchen, preventing the girls from taking food. Mother also did not allow the girls to be in the living room, to watch television, or even to talk to each other because they sometimes argued. Mother told the girls they had to pretend there was " 'a wall between them.' " The girls used " 'a secret sound' " to signal each other when they wanted to talk, but Mother would tell the girls to "stop" if she heard the sound.

Mother did not allow M.S. to take showers; M.S. could only take baths, in three to four inches of water, and the girls had to use the same bath water. Mother did not allow M.S. to wash herself or otherwise care for her personal hygiene. Mother would wash

5

M.S.'s body with a washcloth, would infrequently wash M.S.'s hair, and would put deodorant on M.S., all of which made M.S. uncomfortable. Mother told M.S. that she was incapable of doing these things herself.

M.S. also had to ask Mother's permission to "go 'poop' "; and if she did so without permission, Mother would say, " 'No, I didn't say you could go.' " For discipline, Mother would pinch M.S.'s legs and spank M.S. on her bare bottom.

M.S. could think of nothing "good" to say about her family, even when offered suggestions. M.S. said she wanted to go to the shelter because she had been there before and " 'the people there listen to me and care about me.' " After the firefighters took M.S. to the hospital, the police took M.S. to the shelter, but she was only there for two hours before Mother picked her up. On the drive home, Mother was "really mad" at M.S. for being at the shelter and yelled at her.

The social worker interviewed J.S. at Mother's home on December 27, 2019. J.S. confirmed everything M.S. had said. At the beginning of the interview, J.S. asked the social worker to speak quietly so that Mother would not hear them; and at the end of the interview, J.S. asked the social worker not to tell Mother what they had discussed, or J.S. would be in trouble.

When the social worker arrived for the interview, J.S. was sitting in the living room and the television was on, but J.S. said Mother did that " 'to look good for the social worker.' " That morning, Mother woke J.S. at 3:00 a.m. to help Mother take the "junk and boxes" from the house into the garage and Mother's bedroom. But J.S. said that, as soon as the social worker left, the junk and boxes would be back where they were

6

before the social worker's visit. When the social worker mentioned to J.S. that it was very cold in the home, J.S. said that they never used the heating or air conditioning, but the social worker saw a space heater next to a chaise lounge in the living room where J..S. said Mother slept.

J.S. was dressed much younger than her age of 15 years. She said that Mother treated her and M.S. "like babies" and did not want them to grow up. J.S. said that Mother would discipline the girls by slapping their faces even when they had done nothing wrong. For example, Mother would slap the girls if she could not find something she was looking for, even though the girls had not touched the item. J.S. also reported that Mother would eat at a certain fast food restaurant but did not allow the girls to eat there, although Mother made the girls order Mother's food and present the food to Mother "in a perfect manner." It would be " 'talking back' " if J.S. were to ask Mother why J.S. or M.S. could not have the same food.

The social worker then interviewed Mother. Mother had apparently listened to J.S's interview because Mother commented on some of the things discussed and tried to clarify some other things that J.S. had said. Mother denied physically abusing or spanking the girls; the girls only "thought" she did those things.

Mother did not allow M.S. to stay with Lisa W., where J.S. was staying during the week, because M.S. "love[d] it there." Mother said the December 10 incident at the high school occurred because the school staff would not allow Mother to calm M.S. Mother was trying to hug M.S. because M.S. " 'likes physical pressure,' " and Mother was trying to pull M.S. into her car because too many people were talking to M.S.

On December 30, 2019, M.S.'s therapist expressed concern about Mother's "emotional abuse" of the girls and said that Mother was not "fully equipped" to care for the girls. M.S. was "isolate[ed]" and "alienat[ed]" because she spent so much time alone in her room, there was no family unity, and the girls could not communicate with each other. When the girls were riding in Mother's car, they had to put their hands beneath their bottoms and sit a certain way. Although M.S. had met her treatment goals, M.S. "begged" the therapist not to discharge her.

On January 11, 2020, M.S. was placed on a section "5150 hold" after she attempted to harm herself. Around this time, M.S. reported that Mother hit, punched, and slapped M.S. around 500 times monthly. M.S. was planning to kill herself upon discharge if released to Mother. On January 12, M.S. was transferred to an inpatient mental health hospital.

During a January 14, 2020 interview at the hospital, M.S. looked "somber, defeated, and unhappy"; she "looked and talked like she ha[d] given up." She said she had been suicidal and wanted to hurt herself "for a while." She had "lost hope in the system" and expected no help. She had no support system and had not seen J.S. in three weeks. She was not home on December 19, 2019, because Mother did not want her to talk to the social worker again. M.S.'s stay at the hospital began when Mother took her to the emergency room and said she was having a " 'manic episode.' "

M.S. liked it at the inpatient mental health hospital; it was better than being at home; and it was like a " 'mini-vacation.' " She could eat in the cafeteria, choose her food, get drinks from the drink machine, shower as often as she liked, dress herself, and

8

care for her personal hygiene. But Mother told her she was "on restriction until further notice" for being in the hospital, meaning Mother would not allow her to go outside or leave her room. Mother sometimes did not give M.S. lunch; she would say, "You don't need anything," and she "knew" when M.S. was hungry.

The social worker again spoke with J.S. at her high school on January 14, 2020. J.S. confirmed that she lived with Lisa W. on weekdays so she could attend the high school near Lisa W.'s home. J.S. had recently been staying with Lisa W. on weekends, too, because she did not like going home and she would " 'shut[] down' " at home. J.S. was dressed age-appropriately; she said she had borrowed clothes from friends rather than wear the " 'baby' clothes" Mother bought for her. J.S. appeared "panicked" when she asked whether Mother was near Lisa W.'s home. Mother did not allow her to wear "ripped jeans" or wear her hair up. J.S. had also gotten into trouble with Mother for talking to the social worker on December 19, 2019.

The staff at J.S.'s high school reported many "run-ins" with Mother. J.S. was on the track team, but Mother did not want J.S. to wear the team uniform and made J.S. wear a long-sleeve T-shirt beneath her uniform tank top. During one track meet, Mother took J.S. off the track, causing the entire team to be disqualified. Other times, Mother did not want J.S. to have water.

Lisa W. had known the girls since they were 18 months old. She provided day care for them at that time and thereafter. She was concerned about Mother's treatment of the girls, but said that Mother would take J.S. away, and she would never see J.S. again if she said anything to Mother. Mother did not allow J.S. to attend school football games

9

with Lisa W.'s family, or play on the varsity basketball team, even though the school wanted J.S. to play on the varsity team.

Lisa W. had "babysat" M.S. during the previous school year when M.S. was not enrolled. Lisa W. said the girls were "good kids" who were capable of caring for themselves and their hygiene. Both girls were in her care during the winter break in 2019, and they went places and had fun with Lisa W.'s family. Mother did not want the girls to have their own phones or computers; she would be upset with the girls if they called her from Lisa W.'s cell phone, rather than a landline; and she wanted the girls to call her hourly. The girls would get "very stressed" about having to call Mother hourly, and they would be in trouble if they called Mother "two minutes late." The girls were "100% different" when they talked to Mother than when they were with Lisa W.

On January 15, 2020, Mother wanted to take M.S. home from the hospital against medical advice. Mother was minimizing M.S.'s suicidal ideations, saying M.S. was not serious about suicide. Mother "cussed out" the hospital staff and revoked the medication authorization she had approved for M.S. the day before. M.S. had a plan for her suicide and shared it with her doctor, who approved an extended 14-day hold for M.S. through January 30.

On January 16, 2020, M.S. told a behavioral specialist that Mother told her she could not leave home until she was age 35 because she was "registered" as " 'disabled.' " Both girls said they would have to recant what they had said about Mother and "lie," either in court or in any DPSS meetings involving Mother, in order to avoid being in

10

more trouble with Mother. On January 17, DPSS placed both girls in protective custody. J.S. was placed with Lisa W., and M.S. remained at the inpatient mental health hospital.

On January 22, 2020, DPSS filed a petition alleging jurisdiction for the girls under section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage). The petition alleged that the girls were suffering serious emotional damage due to Mother's "controlling behaviors." Mother allegedly lacked parenting skills, used inappropriate discipline, did not allow the girls to manage their personal hygiene, and deprived the girls of food. The petition further alleged that M.S. was on a section 5150 hold due to Mother's "maltreatment" and that M.S. was threatening suicide if returned to Mother's care.

At the detention hearing on January 23, 2020, the court ordered the girls detained and found that a prima facie showing for jurisdiction had been made under section 300, subdivisions (b) and (c). The girls' counsel told the court that the girls were "relieved" to be out of Mother's care. Mother was authorized to have supervised visits, but the girls were not required to visit her.

On January 23, 2020, M.S. was released from the hospital and placed with Lisa W. But her suicidal ideation continued and on January 29, she was taken to the emergency room, then transferred back to the inpatient mental health hospital on January 30. Meanwhile, Mother was texting Lisa W. daily about how to care for the girls, and Mother would " 'blow up Lisa's phone' " if the girls did not call Mother every 30 minutes. M.S. had also been using Lisa W.'s phone to call Mother without Lisa W.'s permission.

11

On January 27 and 28, 2020, Mother showed up unannounced at Lisa W.'s home. On January 29, Mother told M.S. to kill herself by taking pills. A clinical social worker at the hospital was considering a higher level of treatment for M.S., along with an appropriate placement for M.S. upon her discharge.

After she was returned to the hospital, M.S. would "go[] through defiant times where she wants all the power and control." She would hide things and refuse to give them back to staff. On February 13, 2020, M.S. again reported suicidal ideation after Mother told her she would be better off if she killed herself. On February 14, M.S. was discharged and returned to Lisa W.; but on March 5, she was placed on another section 5150 hold due to suicidal ideation. On March 13, M.S. was placed in a foster home.

On June 12, 2020, DPSS reported that M.S. was having "a hard time" when she was not given what she wanted. In May 2020, she twice left her foster home without permission. On May 11, law enforcement found her walking south on Interstate 15 and returned her to her foster home. On May 19, she was evaluated for another section 5150 hold after she said that she did not care whether she lived or died. She did not meet the criteria for a section 5150 hold, but she left her foster home and showed up at Lisa W.'s home, saying a stranger had given her a ride. She was returned to her foster home on May 20, following a one-day hold.

On May 22, 2020, the foster home gave notice that they were no longer able to take care of M.S., due to her going "AWOL" and not taking her medication. But M.S. stayed in the foster home. In June 2020, M.S. was visiting J.S. every weekend (Friday

through Monday) at Lisa W.'s home. Both girls were saying they wanted no contact with Mother.

Meanwhile, Mother continued to call, e-mail, and text the social worker "often" leaving voicemails "at all hours of the night," and saying she wanted to visit the girls. Mother said she was concerned that DPSS would "sex traffic[]" the girls, and the girls needed to be returned to Mother for their protection. Mother had also been contacting M.S. through e-mails and social media, which reportedly "confuse[d] and emotionally disrupt[ed]" M.S. Among other things, Mother told M.S. that J.S. did not want M.S. "anywhere near" J.S., and that J.S. would "throw any one under the bus . . . to get what she wants."

On July 15, 2020, DPSS reported that M.S. was "doing better," but Mother was "the biggest obstacle." The same day, the court issued a temporary restraining order prohibiting Mother from contacting M.S. On July 28, J.S. was also moved to a new foster home because she had reportedly been "experiencing a lot of difficulty" in Lisa W.'s home. Her new foster home specialized in helping teen girls prepare for adulthood. Before July 28, M.S. was visiting J.S. weekly in Lisa W.'s home.

On August 17, 2020, J.S. told the social worker that she did not want to visit M.S. "at this time." M.S. said she missed J.S. and wanted to see her. M.S. was "doing very well" in her new foster care placement; her behavior was "better," and she was "medication compliant."

A contested jurisdictional and dispositional hearing was held on August 20, 2020. Mother adduced stipulated testimony and asked the court to grant her reunification

13

services. She said she had "tried very hard" and had enrolled the girls in "all sorts of activities" when they were young, but the girls had "a lot of behavioral problems." The court sustained the allegations of the petition (§ 300, subds. (b), (c)), adjudged the girls dependents, ordered the girls removed from Mother's custody, and bypassed reunification services for Mother. (§ 361.5, subd. (b)(6).) The court issued a three-year, permanent restraining order prohibiting Mother from contacting M.S. except during DPSS-supervised visits. The court reduced Mother's visits to a minimum of once monthly but again ordered that the girls not be "forced" to visit. A section 366.26 hearing was scheduled for December 2020.

On September 3, 2020, M.S. was moved to a new foster home, her third foster care placement since March 13, 2020, and the home that became her prospective adoptive home. (§ 366.26, subd. (n).) On November 3, M.S. was briefly hospitalized, after she was lethargic and not waking up at school. She was refusing to eat or drink and appeared "very depressed," but she quickly stabilized and was returned to her prospective adoptive parents within a day. She continued to be prescribed lithium, and she said she did not want Mother to get a hold of her.

M.S.'s November 3, 2020 hospitalization was ostensibly due to Mother's continuing and unauthorized contacts, despite the restraining order. In December 2020, DPSS reported that Mother was continuing to contact M.S., which was upsetting M.S. and "impacting her emotional stability." Mother had acquired "full control" of M.S.'s laptop and access to M.S.'s e-mail account. On M.S.'s social media account, Mother posted a video "eulogy[izing]" the girls and indicating she never loved M.S. Mother also

14

left M.S. voicemails, saying she hated M.S.  DPSS reported it had made sure that Mother no longer had access to M.S.'s social media accounts and communications technology.

Also in December 2020, the girls were in contact with each other by telephone but neither had expressed a desire to visit in person.  M.S. had recently expressed a desire to talk to Mother by telephone, but she did not want to return to Mother's care.  M.S.'s new caregiver, who later became M.S.'s prospective adoptive mother, described M.S. as part of her family, was considering adoption, and was willing to care for M.S. long term.  M.S. was happy in the placement and named her caregiver as her "life-long connection."  Still, neither of the girls' caregivers had committed to adoption.

Thus, in December 2020, DPSS described the likelihood that the girls would be adopted as "fair" and asked the court to vacate the section 366.26 hearing.  But minors' counsel asked the court to continue the hearing for 120 days so that both girls and their caregivers could further explore adoption.  The section 366.26 hearing for both girls was continued to April 19, 2021.

As of April 13, 2021, DPSS needed more time to complete a preliminary adoption assessment for M.S.  Thus, on April 19, the section 366.26 hearing for M.S. was further continued to July 22.  The hearing was vacated for J.S., who was considering returning to live with Lisa W.  Thus, on May 3, J.S.'s permanent plan was changed from adoption to a planned permanent living arrangement (PPLA), but adoption remained M.S.'s permanent plan.

On May 21, 2021, DPSS reported that M.S. was attending a public high school and getting straight A's.  She expected to graduate in 2022 and planned to attend a four-

year college. Her behavior was "good," she had learned to implement "coping skills," and she could "follow instructions/chores without hesitation or redirection." She felt "great overall," but she was no longer participating in therapy because she did not like it. She felt safe and content in her placement, and her needs were being met there. Her now-prospective adoptive mother wanted to adopt her, and she wanted the caregiver to adopt her. DPSS assessed her likelihood of adoption as "good."

On June 4, 2021, the girls' court-appointed special advocate (CASA) reported that M.S. was a "bright, intelligent, funny, and caring young woman." M.S. was meeting with the CASA every other week. M.S. was referring to her prospective adoptive parents as " 'mom' and 'dad,' " and was hopeful that they could adopt her by the end of 2021. The preliminary adoption assessment was filed in July 2021 and showed that M.S. was thriving in her home.

The section 366.26 hearing was held on August 5, 2021, when M.S. was 17 years old. Mother asked the court to not terminate her parental rights and to place M.S. in a long-term guardianship, but M.S.'s counsel told the court that adoption was "important" to M.S. The court terminated parental rights and selected adoption as M.S.'s permanent plan.

The court found that terminating parental rights would not be detrimental to M.S. and that none of the statutory exceptions to adoption applied. The court acknowledged that M.S. "strongly" wished to be adopted and was "thriving" with her prospective adoptive parents. M.S. was also happy and emotionally stable, which was not the case when she was with Mother. The court said it was "consider[ing]" and "follow[ing]"

16

M.S's wish to be adopted because she was "almost an adult." The court also said it had read and considered the preliminary adoption assessment and admitted it into evidence.

On September 3, 2021, DPSS filed a notice of intent to remove child (Form JV-323), stating that M.S. had expressed that she no longer wished to be adopted and was "refusing to return" to the prospective adoptive parents' home. On September 16, Mother filed a notice of appeal from the August 5 orders.

### III. DISCUSSION

Mother claims insufficient evidence supports the August 5, 2021 finding that M.S. was adoptable. Mother first argues that the evidence admitted at the August 5 section 366.26 hearing showed that it was "highly unlikely" that M.S.'s prospective adoptive parents would adopt her. Mother further argues that the postjudgment evidence (DPSS's September 3, 2021 notice of intent to remove a child) is both admissible in this appeal and "undermines" the August 5 adoptability finding. Thus, Mother argues, the section 366.26 orders must be reversed, based on the insufficiency of the evidence to support the adoptability finding, regardless of whether the postjudgment evidence is inadmissible and considered in this appeal.

We conclude that evidence presented at the section 366.26 hearing is sufficient to support the adoptability finding. The postjudgment evidence that M.S. left her prospective adoptive parents' home and no longer wished to be adopted by them is inadmissible in this appeal. Thus, we affirm the section 366.26 orders.

17

A.  *Substantial Evidence Presented at the August 5, 2021 Section 366.26 Hearing*

*Supports the Court's Finding that M.S. Was Adoptable*

We first address whether the evidence presented at the August 5, 2021 section 366.26 hearing is sufficient to support the court's finding that M.S. was likely to be adopted within a reasonable time (§ 366.26, subd. (c)(1)), without considering the postjudgment evidence that, by September 3, M.S. had changed her mind about the adoption and was refusing to return to her prospective adoptive parents' home.  As noted, we conclude that the evidence presented at the section 366.26 hearing is sufficient to support the adoptability finding.

1.  Applicable Law and Standard of Review

If a juvenile court finds based on clear and convincing evidence that it is likely a child will be adopted, "the court shall terminate parental rights and order the child placed for adoption."  (§ 366.26, subd. (c)(1).)  " 'The  issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.' "  (*In re Zeth S.* (2003) 31 Cal.4th 396, 406 (*Zeth S.*), quoting *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.)  "All that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time."  (*Zeth S.*, at p. 406.)

On appeal, we review an adoptability finding for substantial evidence.  (*In re J.W.* (2018) 26 Cal.App.5th 263, 267.)  That is, " 'we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time.' "  (*In re*

18

*Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562.) We give the adoptability finding "the benefit of every reasonable inference" and resolve any evidentiary conflicts in favor of the finding and judgment. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) "It is irrelevant that there may be evidence which would support a contrary conclusion." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

2. Analysis

Here, the evidence presented at the August 5, 2021 section 366.26 hearing amply supports the court's finding that M.S. was likely to be adopted within a reasonable time. (§ 366.26, subd. (c)(1).) Although M.S. was already 17 years old and had a history of mental health problems, she was no longer mentally or emotionally unstable. She was "thriving" in the care of her prospective adoptive parents, with whom she had been living for 11 months, since September 3, 2020.

The record shows that M.S.'s mental, emotional, and behavioral problems had greatly improved during the 11 months she had been living with her prospective adoptive parents. She had never left the home without permission, she was medication compliant, and her medication was working well for her. She and her prospective adoptive parents also shared a strong familial bond, which showed she was capable of forming lasting emotional and familial attachments.

M.S. was last hospitalized on November 3, 2020, around two months after she began living with her prospective adoptive parents, and after she arrived at her school appearing "very depressed" and lethargic. But she quickly stabilized and was returned to her prospective adoptive parents within a day. It also appears that the November 3

19

incident occurred due to Mother's continuing negative and unauthorized contacts with M.S. However, by December 2020, DPSS had made sure that Mother no longer had access to M.S.'s social media accounts, and M.S. had made a "life-long connection" with her prospective adoptive mother, who was describing M.S. as part of the family, was considering adoption, and was committed to caring for M.S. long term.

After December 2020, M.S. continued to improve in her prospective adoptive parents' care. By May 2021, M.S. was getting straight A's in school, and she expected to graduate in 2022 and attend a four-year college. In the July 2021 preliminary adoption assessment, DPSS reported that M.S. had "grown to have more interest and focus in school now that she [was] in a loving home."

M.S.'s behavior was also "good"; she had learned to implement coping skills, and she could follow instructions and complete chores "without hesitation or redirection." She felt happy, safe, and content, and her needs were being met at home. In June 2021, the CASA described her as a "bright, intelligent, funny, and caring young woman." She was meeting with the CASA every other week and was respectful to the CASA.

By July 2021, the prospective adoptive parents were "fully committed" to adopting M.S., and M.S. was expressing a "strong[]" desire to be adopted by them. In sum, all of the evidence showed that M.S. was thriving in the prospective adoptive parents' care. M.S. had overcome great difficulties and had a bright future. All of this evidence amply supports the court's August 5, 2021 finding that M.S. was likely to be adopted within a reasonable time.

Mother argues that M.S.'s advanced age of 17 years and her mental health history, including her numerous mental health hospitalizations and suicidal ideations, "weighed against" finding that she was "generally adoptable." "Instead," Mother argues, "these factors revealed that the only potential basis for adoptability was at the specific-adoptability end of the continuum." Thus, Mother argues, "[g]iven the fact that [M.S.] was closer on the continuum to a 'specific adoptability' child, there was insufficient evidence that [M.S.] was likely to be adopted in a reasonable time."

We pause here to note that a child is considered "specifically adoptable" if the child is adoptable "only because a particular family is willing to adopt." (*In re G.M.* (2010) 181 Cal.App.4th 552, 562 (*G.M.*).) In contrast, a child is considered generally adoptable if the child's positive characteristics, including the child's age, physical condition, and emotional state, make it likely that the child will find an adoptive home within a reasonable time. (See *In re J.W.*, *supra*, 26 Cal.App.5th at pp. 267-268; *In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650.)

But oftentimes, the child will fall somewhere on a "continuum" of specific to general adoptability. (*G.M.*, *supra*, 181 Cal.App.4th at p. 562.) As *G.M.* explained: "Not all dependency cases fall neatly into one of two scenarios: one, the availability of a prospective adoptive parent is *not a factor whatsoever* in the social worker's adoptability assessment; or two, the child is likely to be adopted *based solely* on the existence of a prospective adoptive parent. These scenarios represent opposite ends on the continuum of when a child is likely to be adopted. [But] many adoption assessments that recommend an adoptability finding fall somewhere in the middle. They consist of a

21

combination of factors warranting an adoptability finding, including, as in this case, the availability of a prospective adoptive parent." (*Ibid.*)

M.S., too, falls on the specific to general adoptability continuum. DPSS never opined, and the court never suggested, that M.S. was adoptable solely because she had prospective adoptive parents willing to adopt her. Rather, the record indicates that this was only one of several factors underlying DPSS's adoption recommendation, and the court's finding that M.S. was adoptable. M.S.'s many positive characteristics also support the adoptability finding. As discussed, M.S. was "thriving," and made great progress in addressing her mental health problems, while in a safe and loving home.[3]

Mother more specifically argues that several "red flags stripped the adoptability finding of substantial evidence." These "red flags" emphasize M.S.'s previous struggles with her mental and emotional health. Mother notes that M.S. "had a history of frequent placement changes and not following placement rules," and that M.S. also "struggled in the past with leaving her placements without permission." Mother also points out that, in September 2020, the month that M.S. went to live with the couple who later became her

---

[3] DPSS "acknowledges" that M.S.'s age of 17 years "likely means she was adoptable due to being in an identified adoptive home." We agree that the prospective adoptive parents' willingness to adopt M.S. was a factor weighing in favor of the court's finding that M.S. was adoptable, but the record indicates that it was not the sole factor underlying the court's adoptability finding, or DPSS's adoption recommendation. Rather, M.S.'s positive characteristics, including her great progress in addressing her mental health problems, as well as the existence of a prospective adoptive parent, weighed in favor of finding that she was adoptable. (*In re David H.* (1995) 33 Cal.App.4th 368, 378 ["The present existence or nonexistence of a prospective adoptive parent . . . is a factor in determining whether the child is adoptable, but is not in itself determinative."].)

prospective adoptive parents, M.S.'s doctor described her as having a history of "[b]ipolar disorder, depression, trauma, ODD, ADHD, Anxiety, reactive attachment disorder, unspecified impulse disorder, ptsd and multiple hospitalizations in the past, along with suicidal ideation, and suicide attempts. Patient continue[s] to have ongoing issues with and labile mood."

In sum, Mother argues that, "because [M.S.] was not generally adoptable, the Agency was required to make a more robust showing of specific adoptability." For the reasons discussed, we disagree. DPSS made a sufficient showing that M.S. was *adoptable*, based on a combination of her positive characteristics and her prospective adoptive parents' steadfast willingness to adopt her. (*G.M.*, *supra*, 181 Cal.App.4th at p. 562.) Substantial evidence also supports the court's finding that M.S. was likely to be adopted within a reasonable time. (§ 366.26, subd. (c)(1).)

Lastly, Mother argues that M.S.'s mental health, and her emotional and behavioral problems, were "glaring impediments" to her "actual adoption." To the extent Mother is suggesting that those factors were *legal* impediments to M.S.'s adoption, Mother is mistaken. As DPSS points out, "frequent placement changes and emotional instability are not legal impediments to adoption." A legal impediment to adoption pertains to the *legal capacity* of the *prospective adoptive parent* to adopt the child. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650; Fam Code, §§ 8601-8603.) Mother does not claim that

23

the prospective adoptive parents had any legal impediments to adopting M.S., and none are evident in this record.[4]

B. *The Postjudgment Evidence That M.S. Left Her Prospective Adoptive Home and Was Saying She No Longer Wished to Be Adopted Is Inadmissible in This Appeal*

Mother next claims that "post-judgment evidence in the record conclusively undermines the juvenile court's adoptability finding." Mother refers to the notice of intent to remove child, filed on September 3, 2021, in which DPSS reported that M.S. "expressed [that] she no longer wishes to be adopted and [was] refusing to return to the prospective adoptive parents' home." Mother argues that this court "should" consider the postjudgment evidence because it "shows" that M.S.'s adoption with the prospective adoptive parents "will not occur." We conclude that the postjudgment evidence is inadmissible in this appeal.

In *Zeth S.*, our Supreme Court refused to consider postjudgment evidence, in the form of an unsworn statement by the child's appointed counsel on appeal, set forth in counsel's letter brief on appeal, that " 'the minor's current caretaker was pressured into saying he wanted to adopt the child, and would prefer to be the child's legal guardian.' " (*Zeth S.*, *supra*, 31 Cal.4th at pp. 403-404, 407, 413.) The court noted that counsel's unsworn statements were "not evidence" and "did not even directly relate to, much less

---

**4** When a social worker's opinion that a child is adoptable is based *at least in part* on the willingness or commitment of an identified prospective adoptive parent to adopt the child, the court should consider whether there are any legal impediments *to the prospective adoptive parent's* ability to adopt the child. (*G.M.*, *supra*, 181 Cal.App.4th at pp. 562-563.) But here, Mother does not point to any legal impediments to the prospective adoptive parents' ability to adopt M.S.

24

undermine, the juvenile court's finding of the adoptability of the minor . . . ." (*Id.* at p. 413, fn. 11.)

More broadly, *Zeth S.* "conclud[ed] that consideration of postjudgment evidence of changed circumstances in an appeal of an order terminating parental rights, and the liberal use of such evidence to reverse juvenile court judgments and remand cases for new hearings, would violate both the generally applicable rules of appellate procedure, and the express provisions of section 366.26 which strictly circumscribe the timing and scope of review of termination orders, for the very purpose of expediting the proceedings and promoting the finality of the juvenile court's orders and judgment." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. omitted.) As Mother points out, however, the court expressly left open the question of whether "any particular circumstances may give rise to an exception to the general rule that postjudgment evidence is inadmissible in a juvenile dependency appeal from an order terminating parental rights." (*Id.* at p. 413, fn. 11.) Such exceptions could be warranted in "rare and compelling" cases. (*Id.* at pp. 399-400.)

In *Zeth S.* the court noted that it had previously recognized one such exception. In *In re Elise K.* (1982) 33 Cal.3d 138 (*Elise K.*), "all of the parties were in agreement, and offered to stipulate, that due to changed circumstances and the minor's advanced age, the minor in that case *was no longer adoptable* . . . , thereby undermining the foundational basis of the trial court's order terminating [the] mother's custody and control over the minor." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.) *Elise K.* thus "determined that it was appropriate to accept that stipulation," and reversed the order terminating parental rights based on the stipulation. (*Zeth S.*, at p. 413, fn. 11; see *Elise K.*, at p. 139.)

25

*Zeth S.* then noted that "*Elise K.* therefore serves as precedent for the proposition that where postjudgment evidence *stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much and express a willingness to stipulate to reversal of the juvenile court's judgment*, an appellate court acts *within its discretion* in accepting such a stipulation and reversing the judgment. Beyond that scenario, however, the nature and scope of any exception to the general rule of nonadmissibility of postjudgment evidence in an appeal by a parent or parents from an order terminating parental rights must await a case in which the facts squarely present the issue." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11, italics added.)

Mother argues that this case presents the "precise" circumstances warranting an exception to the general rule that postjudgment evidence is inadmissible in an appeal from an order terminating parental rights. (*Zeth S.*, *supra*, 31 Cal.4th at p. 413.) She argues that, in contrast to the unsworn statement of counsel at issue in *Zeth S.*, DPSS's statements that M.S. was refusing to return to her prospective adoptive home and no longer wished to be adopted are both (1) reliable and (2) material to the question of M.S.'s adoptability. The statements are reliable, Mother argues, because they are sworn; the social worker signed the form JV-323 under penalty of perjury and the statements are material because they "directly" undermine the court's adoptability finding, in that M.S.'s refusal to consent to her adoption "ensures that the adoption will not occur" given that the adoption of a child over the age 12 requires the child's consent. (Fam. Code, § 8602.)

We agree that the postjudgment statements in form JV-323 are reliable, given that they are both sworn and undisputed by the parties to this appeal. We note, too, that the

26

parties have submitted no further postjudgment evidence showing that, after September 2021, M.S. consented to be adopted by her former prospective adoptive parents and either has been or expects to be adopted by them before she turns age 18 in June 2022. As the parties agree, there is insufficient time to assess another family for adoption, if there was one. Thus, we agree that the postjudgment evidence conclusively shows that M.S. has not been adopted and will not be adopted before she turns age 18.

But this *post hoc* showing that M.S. *will not* be adopted is not material to whether at the time of the August 5, 2021 section 366.26 hearing, M.S. was likely to be adopted within a reasonable time of the August 5 hearing. In fact, the postjudgment showing has no bearing on whether on August 5 M.S. was likely to be adopted within a reasonable time of August 5. At a section 366.26 hearing, "[a]ll that is required is clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*Zeth S.*, *supra*, 31 Cal.4th at p. 406, added italics; 366.26, subd. (c)(1).) No showing is required that the child *will be adopted* within a reasonable time. Indeed, the juvenile court can only base a "likelihood of adoption" finding on facts and circumstances that have occurred at the time of the hearing. And here, the postjudgment evidence that M.S. *will not*, as it turns out, be adopted, contrary to the expectations that were obtained at the time of the hearing, does not concern any facts or circumstances that occurred but were not known at the time of the hearing and that could not, with reasonable diligence, have been discovered before the hearing.

Given that the postjudgment evidence has no bearing on whether, as of August 5, 2021, M.S. was likely to be adopted within a reasonable time of August 5, the

27

postjudgment evidence does not "completely undermine" the legal underpinnings, or the facts and circumstances supporting, the court's August 5, 2021 finding that M.S. was likely to be adopted within a reasonable time of August 5.  As discussed, the evidence presented at the August 5 hearing shows that M.S. was both specifically and generally adoptable and was likely to be adopted within a reasonable time of August 5.

Further, *Zeth S.* specifically disapproved of the practice of taking postjudgment evidence on appeal that purports to undermine the legal underpinnings of section 366.26 orders, particularly when, as here, there was, " 'strictly speaking, no "error" by the juvenile court'" based on the evidence presented at the section 366.26 hearing.  (*Zeth S.*, *supra*, 31 Cal.4th at p. 411, disapproving *In re Jayson T.* (2002) 97 Cal.App.4th 75.)  As the court explained, one of the problems with this approach is that "it effectively substitutes the reviewing court's own post hoc determination of whether termination of parental rights remains in the minor's best interests[] for the legislatively mandated determination that follows when the comprehensive juvenile dependency statutory scheme is dutifully adhered to in the trial court.  The Legislature, however, has determined that what is in the child's best interests is best realized through implementation of the procedures, presumptions, and timelines written into the dependency statutes.  The statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child' best interests for the trial courts' determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions."  (*Zeth S.*, at pp. 409-410.)

28

As the court also emphasized: "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.] . . . The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review and serves to avoid prolonged delays on appeal." (*Zeth S.*, *supra*, 31 Cal.4th p. 405.) Avoiding prolonged delays on appeal is particularly critical in juvenile dependency cases, given that the "primary goal" of the juvenile dependency statutory scheme is to "expedite finality and thereby achieve permanency for the child." (*Id.* at pp. 405-406.)

Thus, we are not persuaded that Mother's proffered postjudgment evidence that M.S. left her prospective adoptive home in September 2021 and will not be adopted before she turns age 18 is admissible in this appeal under the "rare and compelling case" exception articulated in *Zeth S. Zeth S.* indicated that, to be admissible, postjudgment evidence must "*completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much and express a willingness to stipulate to reversal of the juvenile court's judgment.*" (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.) These circumstances are not present here. DPSS and M.S's appellate counsel disagree that the postjudgment evidence completely undermines the August 5 adoptability finding and are unwilling to stipulate to reverse the section 366.26 orders and reinstate Mother's parental rights. Their unwillingness to cooperate with Mother's counsel is based on sound reason, given that the postjudgment evidence has no bearing on, much less completely undermines, the August 5 adoptability finding.

Mother has also pointed to no case, nor are we aware of any, in which a Court of Appeal has accepted postjudgment evidence under circumstances that do not fall within the limited exception of *Elise K.*. (Cf. *In re B.D.* (2019) 35 Cal.App.5th 803, 815-818 [accepting postjudgment evidence on appeal "under the *Elise K.* exception to the rule handed down in *Zeth S.*," where all of the parties agreed that " 'subsequent events' " (actually, subsequently *discovered* events that were known at the time of the section 366.25 hearing but that the agency withheld from its reports) undermined the adoptability finding by showing it was based on incomplete evidence, thus undermining the integrity of the section 366.26 orders]; *In re Allison B.* (2022 Cal.App.LEXIS 465 [accepting postjudgment evidence that parent's appeal based on agency's ICWA noncompliance was moot where the postjudgment evidence showed the agency belatedly complied with ICWA and there was no reason to believe the child was an Indian child].)

In these cases, admitting the postjudgment evidence and stipulated reversals of the section 366.26 orders advanced the children's best interests and the dependency scheme's "primary goal" to "expedite finality and thereby achieve permanency for the child." (*Zeth S.*, *supra*, 31 Cal.4th at pp. 405-406.) Admitting the postjudgment evidence in this case would undermine that goal by encouraging parents to challenge section 366.26 termination orders based on events occurring after the section 366.26 hearing, even when, as here, the agency and child for good reason dispute that the postjudgment events have any bearing on, much less completely undermine, the section 366.26 orders. We cannot articulate a solid principle, or point to any authority, that authorizes us to admit the

postjudgment evidence in this case and reverse the section 366.26 orders based on the postjudgment evidence.

DPSS correctly points out that *M.S.*, but not Mother, may petition the juvenile court to reinstate Mother's parental rights, before M.S. turns 18 years of age, pursuant to section 366.26, subdivision (i)(3). In 2005, after *Zeth S.* was decided in 2003, the Legislature amended section 366.26 to add subdivision (i)(2) (Stats. 2005, ch. 626, § 1, eff. Jan. 1, 2006; see *In re I.I.* (2008) 168 Cal.App.4th 857, 871), which later became subdivision (i)(3). Subdivision (i)(3) allows the child but not the parent to petition the juvenile court to reinstate parental rights pursuant to section 388, and under other specified circumstances, including when the child has not been adopted as planned and adoption is no longer the child's permanent plan. DPSS notes that subdivision (i)(3) can prevent a child from becoming a "legal orphan[]," (*In re I.I.*, at p. 871) "an outcome the law abhors" (*In re B.D.*, *supra*, 35 Cal.App.5th at p. 818 & fn. 7). But only the child is authorized to petition the court to prevent that outcome; the parent is not.

Indeed, no statute, including section 366.26, subdivision (i)(3), authorizes *a parent* to petition the juvenile court to reinstate parental rights under any circumstances. Thus, a parent has no statutory means of petitioning the juvenile court to reinstate parental rights based on changed circumstances or new evidence, which necessarily includes postjudgment evidence—evidence of events occurring after the section 366.26 hearing. (§§ 366.26, subd. (i)(3), 388.) In fact, section 366.26, subdivision (i)(1), indicates that the Legislature intended to prohibit parents from challenging section 366.26 orders based on postjudgment evidence. It states: "Any order of the court permanently terminating

31

parental rights under this section shall be conclusive and binding upon the child, upon the parent or parents" and others (§ 366.26, subd. (i)(1)), and it provides no means for a parent to challenge a section 366.26 order based on events occurring after the section 366.26 hearing. In any event, the Legislature's failure, since *Zeth S.* was decided in 2003, to enact a statute allowing parents to challenge section 366.26 orders based on postjudgment evidence further persuades us that this case should not be deemed a "rare and compelling case," warranting an exception to the rule that postjudgment evidence cannot be used to collaterally attack orders terminating parental rights. (*Zeth S.*, *supra*, 31 Cal.4th at pp. 399-400.)

Mother further argues that "equitable principles weigh in favor of examining" the postjudgment evidence. She correctly points out that, if this court does not "examine" the postjudgment evidence, she will have "no path available to seek reinstatement of her parental rights." Indeed, Mother's only authorized means of challenging the section 366.26 orders is in this direct appeal from those orders. (See § 366.26, subd. (i)(1); *Zeth S.*, *supra*, 31 Cal.4th at p. 407, fn. 4 & p. 413.) But the juvenile dependency scheme, including section 366.26, reflects the Legislature's determination that parents of dependent children *not* be afforded any means of collaterally attacking section 366.26 orders, and that such parents only be allowed to challenge such orders on direct appeal, based on the evidence presented at the section 366.26 hearing. (See *Zeth S.*, at pp. 412-413.) It is not for this court to provide parents with a means of collaterally attacking section 366.26 orders when the Legislature has not seen fit to do so.

Last, Mother argues that our review of the postjudgment evidence "would prevent inequity between Mother's parental rights as to [J.S.], which remain intact, and Mother's parental rights as to M.S., which have been terminated." Mother claims this "arbitrary disparity" should be remedied, given that the postjudgment evidence "unequivocally shows" that M.S.'s adoption will not occur. We disagree. Again, Mother's sole means of challenging the section 366.26 orders is in this direct appeal, and the postjudgment evidence is inadmissible in this appeal.

## IV. DISPOSITION

The August 5, 2021 section 366.26 orders terminating Mother's parental rights to M.S. and selecting adoption as M.S.'s permanent plan are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
Acting P.J.

I concur:


RAPHAEL _____
J.

33

[*In re M.S.; DPSS v. D.S.*, E077740]

MENETREZ, J., Dissenting.

"The consent of a child, if over the age of 12 years, is necessary to the child's adoption."  (Fam. Code, § 8602; see *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333, fn. 3.)  When the juvenile court conducted the selection and implementation hearing on August 5, 2021, M.S. was 17 years old and represented that she wanted to be adopted.  In reliance on that representation, the court found that M.S. was likely to be adopted.  On the basis of that required factual finding, the court terminated the parental rights of appellant D.S. (Mother).  (Welf. & Inst. Code, § 366.26, subd. (c)(1).)

Less than one month later, on September 3, 2021, the Riverside County Department of Public Social Services (DPSS) filed a JV-323 "Notice of Intent to Remove Child" stating that M.S. "expressed she no longer wishes to be adopted and she is refusing to return to the prospective adoptive parents['] home."  Mother argues that the termination of parental rights should be reversed because M.S.'s withdrawal of her consent to adoption conclusively refutes the required factual finding on which the termination was based.  I agree, and I therefore respectfully dissent.

Under *In re Zeth S.* (2003) 31 Cal.4th 396 (*Zeth S.*), in general we cannot "receive and consider postjudgment evidence that was never before the juvenile court, and rely on such evidence outside the record on appeal to reverse the judgment," subject to an exception for a "rare and compelling case."  (*Id.* at p. 400.)  Here, the JV-323 was filed in the trial court and was included in the clerk's transcript, so it is not "outside the record on

1

appeal" (*ibid.*). But because the JV-323 was not filed until after parental rights were terminated, it is clearly within the spirit of the *Zeth S.* rule. The only remaining question is whether this case falls within the exception for rare and compelling cases.

If this is not a rare and compelling case, then nothing is. It is rare because, as best I can determine, there has not been a single reported or unreported appellate case like it (i.e., a challenge to the termination of parental rights on the basis of a posttermination withdrawal of consent to adoption by a child over age 12) in the nearly 20 years since *Zeth S.* was decided. It is compelling because M.S.'s withdrawal of her consent to adoption conclusively refutes the required factual finding on which the termination of parental rights was based. Mother's parental rights cannot be terminated unless M.S. is likely to be adopted. M.S. cannot be adopted without her consent, so her withdrawal of consent means that the likelihood that she will be adopted is zero. (As the majority opinion acknowledges, M.S. will turn 18 shortly; there would be no time to find a new adoptive placement even if she changed her mind again.)

*Zeth S.* acknowledged the continuing validity of *In re Elise K.* (1982) 33 Cal.3d 138 (*Elise K.*), in which a termination of parental rights was reversed on the basis of postjudgment evidence that (1) the child was removed from her adoptive home because she "'was experiencing problems'" there and (2) her "age—then nearly 14 years old— made her no longer adoptable." (*Elise K.*, *supra*, at p. 145.) The parties stipulated to reversal of the termination of parental rights. (*Id.* at p. 139.) *Zeth S.* described *Elise K.* "as precedent for the proposition that where postjudgment evidence stands to completely

2

undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much and express a willingness to stipulate to reversal of the juvenile court's judgment, an appellate court acts within its discretion in accepting such a stipulation and reversing the judgment." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.)

Both *Zeth S.* and *Elise K.* were applied recently in *In re B.D.* (2019) 35 Cal.App.5th 803 (*B.D.*), in which the juvenile court terminated parental rights but subsequently learned that extensive and critically important information about the safety and suitability of the adoptive home had been omitted from the social worker's reports. (*B.D.*, *supra*, at pp. 810-812.) The Court of Appeal concluded that "this is one of those 'rare and compelling case[s]' [citation] 'where postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much' [citation]." (*Id.* at p. 809.) The case was remanded for a new selection and implementation hearing at which the juvenile court could determine, on a properly developed record, whether the child was likely to be adopted. (*Id.* at pp. 810, 827-828.)

The present case is more compelling than *Elise K.* and *B.D.* In those cases, the postjudgment evidence merely cast doubt on whether the child was likely to be adopted. In *Elise K.*, although the social worker opined that the child was not likely to be adopted because she was almost 14, there was no indication that the child did not wish to be adopted or that adoption was otherwise impossible. In *B.D.*, the appellate court recognized that at the new selection and implementation hearing on remand, the juvenile

court might again find the child likely to be adopted and terminate parental rights. But here, *it is undisputed that M.S. has withdrawn her consent to adoption, that she is about to turn 18, and that it is therefore impossible that she will be adopted.*

This is therefore a case in which "postjudgment evidence stands to completely undermine the legal underpinnings of the juvenile court's judgment under review, and all parties recognize as much." (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11.) The only thing missing is that, unlike in *Elise K.* and *B.D.*, the parties do not stipulate to reversal. That is, DPSS and M.S. want to leave the juvenile court's order undisturbed even though they do not and cannot deny that the order's legal underpinnings have been completely undermined. Under these circumstances, I do not see why the refusal to stipulate to reversal should make any difference.

Finally, the majority opinion limits the rare and compelling case exception to postjudgment evidence that shows the trial court's order was erroneous *when made*. (See, e.g., maj. opn., *ante*, at p. 27.) I am not aware of any authority for such a limitation. The reversal in *Elise K.*, for example, was based on events that took place after parental rights were terminated (*Elise K.*, *supra*, 33 Cal.3d at pp. 139, 144-145), and *Zeth S.* approved *Elise K.* (*Zeth S.*, *supra*, 31 Cal.4th at p. 413, fn. 11).

The court in *B.D.* observed that "[p]ublic trust in the judiciary is uniquely at stake when the basis for termination of parental rights is called into question." (*B.D.*, *supra*, 35 Cal.App.5th at 820.) I agree. No party or member of this panel denies that because of M.S.'s withdrawal of her consent to adoption, the termination of Mother's parental rights

is now factually and legally baseless.  The law does not require us to shut our eyes to those facts or to their legal consequences.  The order terminating Mother's parental rights should accordingly be reversed, and I therefore respectfully dissent.

MENETREZ    

J.